MILWAUKEE HORSE AND COW COMMISSION COMPANY,
Appellant, vs. HILL and others, Commissioners of
Agriculture and Markets, and others, Respondents.
WEISFELDT, Appellant, vs. HILL and others, Commissioners
of Agriculture and Markets, and others, Respondents.

*February 12—March 8, 1932.*

For the appellants there were briefs by *La Follette, Rogers & Roberts* of Madison, attorneys, and *Daniel H. Grady* of Portage and *W. Wade Boardman* of Madison of counsel, and oral argument by *Mr. Boardman* and *Mr. Grady*.

For the respondents there was a brief by the *Attorney General* and *Fred M. Wylie,* deputy attorney general, for the Commissioners of Agriculture and Markets, and by *Kuehl & Crownhart* of Madison, attorneys for Becker and Winkelman, and oral argument by *Mr. Wylie* and *Mr. C. H. Crownhart*.

OWEN, J. The Milwaukee Horse and Cow Commission Company is a Wisconsin corporation. Max Weisfeldt is the president of the corporation. These actions are brought to restrain state officials, whom we shall, for brevity, designate as the state fair board, from leasing certain stock barns on the state fair grounds to the defendants Albert Becker and Paul Winkelman.

The complaint of the Milwaukee Horse and Cow Commission Company alleges that on the 24th day of September, 1931, the state fair board caused to be executed to the defendants Becker and Winkelman a purported lease of certain barns and stables located on the state fair grounds; that the buildings so attempted to be leased are to be used to receive horses and cattle which said Becker and Winkelman may purchase throughout the state for resale, and which will be kept in said stables and barns pending their resale; that said defendants Becker and Winkelman will conduct public sales of horses and cattle in said premises each Wednesday during the term of said alleged lease, and that they sought and accepted said lease because they could procure the same at a less rental than they would have to pay for similar quarters elsewhere, and for the further reason that the very location of said business in the state fair park constitutes a distinctly advantageous position over every other competitor in the same business; that the state fair board refused to execute to the Milwaukee Horse and Cow Commission Company a similar lease, on the ground that the state fair board had determined, as a state policy, that no cattle or horses other than cattle or horses showed and displayed at the annual state fair should be kept in the barns and stables in the state fair park, and that, relying on said declared policy, plaintiff leased adjacent lands across from the state fair park, upon which it erected barns and stables at a cost of approximately $15,000, where it conducts its business as a livestock commission company; that the lease to the defend-

ants Becker and Winkelman constitutes an unjust discrimination against the plaintiff, and that it will in effect give defendants Becker and Winkelman a monopoly in the rental of all unoccupied barns on the said state fair park, contrary to the public policy of this state; that in addition to the $15,000 which the plaintiff Commission Company has invested in its barns and stables, it has an additional investment of approximately $17,000 in its business, and that if Becker and Winkelman are permitted to operate under their lease plaintiff will suffer a serious and irreparable damage to its business, the amount of which, while extensive, is impossible of ascertainment. It declares the invalidity of the lease upon various grounds, the principal one being that the statutes vest no authority in the state fair board, or any other state official, to thus lease the barns and stables on the state fair grounds.

The complaint of Max Weisfeldt is that of a taxpayer's action, pure and simple. He alleges that the attempted lease of said barns and stables by the said state fair board to Albert Becker and Paul Winkelman is without any authority of law; that none of the defendants in this action have any authority to lease the said state fair park, or any part thereof, for any private purposes at a time when the state fair is not in progress; that the operations of defendants Becker and Winkelman, under the pretended lease, will result in a loss of prestige, good-will, and patronage of the Wisconsin annual state fair; that plaintiff is informed and verily believes that many breeders of high-grade stock object to the housing of private stock in the barns of the state fair park because of the fear of contagious diseases and other contamination; that the agricultural exhibitions and showings of the state fair are likely to suffer considerably and the public deprived of the benefits of such showing; that, in addition thereto, the barns and other property of the state fair park will suffer considerable wear, tear, and physical

depreciation; that such damage is irreparable, and that plaintiff and other taxpayers of the state of Wisconsin are without any remedy at law or any other remedy in equity. The prayer is for judgment declaring the lease illegal and void and for its cancellation, and that the defendant state fair board be enjoined and restrained from in any way entering into the terms of said pretended lease, or permitting or allowing any compliance with said terms, and from in any way leasing the said Wisconsin state fair park, or any part thereof, for any purpose other than that provided by law.

It will be seen that the plaintiffs in these two cases are allied in interest, and that these actions are brought for the purpose of securing the same relief. They were briefed and argued together, and will be disposed of in a single opinion.

The lower court sustained the demurrers to the complaints on the ground that plaintiffs have no legal capacity to bring these actions. Before proceeding to review the correctness of this ruling, we desire to advert to a practice on the part of trial courts of which the attorney general complains with much feeling.

A temporary restraining order was issued in the action brought by the Commission Company, *ex parte,* and without any notice to the defendants. The attorney general complains that there is an apparent disposition on the part of trial judges to regard the interference with state government by injunction as a mere casual matter, and that they are too prone to embarrass state officers by temporary restraining orders issued *ex parte* and without any opportunity for the state officers to be heard, laying upon them the burden of instituting unnecessary proceedings to secure a vacation of such restraining orders.

We agree with the attorney general that interference with the affairs of state government is not a light or trifling

matter, and seldom, if at all, should be done upon a mere *ex parte* motion. The federal government attaches such seriousness to the interference with the ordinary and usual operations of state government that it requires a conference of three sitting judges before an injunction shall issue. We think it entirely proper that, wherever it can be done without apparent serious results, trial courts refrain from interfering with the course of state government, except on motion and an opportunity given the officials interested to be heard.

The serious question presented upon this appeal is whether these actions, or either of them, may be maintained by the plaintiffs. It was said in *Judd v. Fox Lake,* 28 Wis. 583, at p. 587:

"The general principle that equity possesses no power to revise, control, or correct the action of public, political, or executive officers, or bodies, is of course well understood. It never does so at the suit of a private person, except as incidental and subsidiary to the protection of some private right, or the prevention of some private wrong, and then only when the case falls within some acknowledged and well defined head of equity jurisprudence."

The court cited in support of this proposition *Doolittle v. Supervisors of Broome County,* 18 N. Y. 155, where it was said:

"Where there is a question of official discretion, it must be decided by the officers in whom the constitution and laws have vested the discretion. If it be one of jurisdiction, a party who, in common with his fellow-citizens, is menaced by it must, in respect to his legal remedy, wait until his individual rights are invaded. If the grievance consists in an alleged illegal exercise of official functions, those who question them, if they would have a preventive remedy, must invoke the action of the officer whom the law has appointed to sue in such cases. No private person or number of persons can assume to be the champions of the community,

and in its behalf challenge the public officers to meet them in the courts of justice to defend their official acts."

And again it is said:

"Every person may legally question the constitutional validity of an act of the legislature which affects his private rights; but if a citizen may maintain an action for such a purpose in respect to his rights as a voter and taxpayer, the courts may regularly be called upon to revise all laws which may be passed."

As illustrative of this doctrine may be cited the general principle that one may not maintain an action to abate a nuisance unless he suffers special injury therefrom in addition to that suffered by the public generally; that an individual may not challenge the constitutionality of a law except where it affects his constitutional rights; that one may not challenge the validity of a franchise granted by the state unless his personal rights are involved (*Allen v. Clausen,* 114 Wis. 244, 90 N. W. 181, and many cases there cited) ; that a private individual cannot enjoin the misuse of public property, such as parks, except where a special injury results to him by reason of such misuse. *McCormick v. Chicago Yacht Club,* 331 Ill. 514, 163 N. E. 418, 60 L. R. A. 763 and note on p. 770. While this general principle is, we believe, recognized as sound by all authorities, deviations therefrom have not been entirely consistent, and some courts have manifested a greater liberality in the matter of permitting private individuals to maintain private actions to correct what seemed to be purely public evils, than is supported by the general current of authority and, especially, by the established law of this jurisdiction, as will be revealed by a consideration of the following cases: *State ex rel. Adkins v. Lien,* 9 S. Dak. 297, 68 N. W. 748; *Hyatt v. Allen,* 54 Cal. 353; *Chumasero v. Potts,* 2 Mont. 242; *State v. Brown,* 38 Ohio St. 344; *State v. Ware,* 13

Oreg. 380, 10 Pac. 885; *Sansom v. Mercer*, 68 Tex. 488, 5 S. W. 62; *State v. Weld*, 39 Minn. 426, 40 N. W. 561; *State v. Kearney*, 25 Neb. 262, 41 N. W. 175; *Moses v. Kearney*, 31 Ark. 261; *State v. County Judge of Marshall County*, 7 Iowa, 186; *State v. City Council of Camden*, 39 N. J. Law, 620; *Board of Comm'rs of Clark County v. State*, 61 Ind. 75; *State v. Francis*, 95 Mo. 44, 8 S. W. 1; *Union Pac. R. Co. v. Hall*, 91 U. S. 343. These cases are here cited because they have been reviewed and considered, and it is thought that their collation here may prevent a duplication of effort some time in the future. There is no point, however, in attempting a more general review of them, or in attempting to distinguish them in this opinion, in view of the settled law of this jurisdiction.

The taxpayer's action has come to be recognized as a common form of action in this jurisdiction, but an essential element to the maintenance of the action is that the taxpayers as a class will suffer injury from the threatened official action of a municipal officer, separate and distinct from the injury that will be sustained by the public at large. "The philosophy of the taxpayer's action in the circuit court is that the taxpayer is a member of a municipal corporation, who, by virtue of his contributions to the funds of the municipality, has an interest in its funds and property of the same general quality as the interest of a stockholder in the funds of a business corporation, and hence when corporate officers are about to illegally use or squander its funds or property he may appeal to a court of equity on behalf of himself and his fellow stockholders (*i. e.* taxpayers) to conserve and protect the corporate interests and property from spoliation by its own officers. The taxpayer himself is the actual party to the litigation, and represents not the whole public, nor the state, nor even all the inhabitants of his municipality, but a comparatively limited class, namely,

the citizens who pay taxes. In short, he sues for a class."
*Income Tax Cases,* 148 Wis. 456, at p. 500, 134 N. W.
673, 135 N. W. 164.

A review of the taxpayers' actions which have been main-
tained in this state has revealed, with perhaps a single
exception to be noted later, some injury to the taxpayers as
a class, separate and distinct from wrongs suffered by the
public generally. Where this has not appeared, the right
to maintain the action has been denied, notably in *Stone v.
Oconomowoc,* 71 Wis. 155, 36 N. W. 829, and *Bell v.
Platteville,* 71 Wis. 139, 36 N. W. 831. The opinion of
Timlin, J., in the *Income Tax Cases,* 148 Wis. 456, at
p. 519, 134 N. W. 673, 135 N. W. 164, contains such a
faithful review of this class of actions in this state that
it seems that our present responsibility may be fully dis-
charged by a reference to that opinion.

With this principle in mind, we examine the complaint
in the action of Max Weisfeldt with a view of determining
whether there is any injury alleged that is peculiar to Max
Weisfeldt, or to taxpayers generally. The complaint al-
leges that "the operations of defendants Albert Becker and
Paul Winkelman, under the pretended lease, as aforesaid,
or such operations by any private party, will result in a loss
of prestige, good-will, and patronage of the Wisconsin
annual state fair; that plaintiff is informed and verily be-
lieves that many breeders of high-grade stock object to the
housing of private stock in the barns of the state fair park
because of the fear of contagious diseases and other con-
tamination; that the agricultural exhibitions and showings
of the state fair are likely to suffer considerably and the
public deprived of the benefit of such showings; that in
addition thereto, the barns and other property of the state
fair park will suffer considerable wear, tear, and physical
depreciation; that such damage is irreparable, and that
plaintiff and other taxpayers of the state of Wisconsin are

without any remedy at law or any other remedy in equity."
We consider that whether the use of barns and stables by
Becker and Winkelman will result in a "loss of prestige,
good-will, and patronage" of the Wisconsin state fair is
nothing more than the expression of an opinion, and is not
the allegation of a fact which is subject to proof and de-
termination. It is a question upon which the opinions of
men may differ, but which is not at all susceptible of proof.
It is a question which can be passed upon only as a matter
of policy. It is a matter of pure speculation. The affidavits
produced upon the motion to vacate the temporary re-
straining order issued in this case indicate that it is a matter
which has had the consideration of those responsible for
the conduct of the state fair, and that they have intelligently
arrived at a conclusion that such use of the state fair build-
ings will not militate against the patronage or the best inter-
est of the state fair. This is the only respect in which it is
alleged that the plaintiff or the members of his class will
suffer any special injury. We think the allegation is en-
tirely insufficient to enable the maintenance of the action
by the plaintiff Max Weisfeldt.

In this connection the case of *Tyre v. Krug,* 159 Wis.
39, 149 N. W. 718, is relied upon with much assurance.
In that case it appeared that the principals of five public
high schools in the city of Milwaukee devoted a portion
of the public school buildings to the sale of school books
and supplies. The plaintiff was then and had been for
years a dealer in school books and school supplies, and
his business suffered by reason of the competition of the
school principals. While it was held that the plaintiff had
improperly united a cause of action in his favor for dam-
ages with a cause of action which he prosecuted as a tax-
payer, it was apparently held that he could maintain his
action as a taxpayer. The question of whether he had a
sufficient interest to maintain the action as a taxpayer re-

ceived no consideration whatever by the court. The court gave dominant consideration to the view that school buildings are to be dedicated to the purposes contemplated by the statutes in maintaining the public schools and providing popular instruction, a principle declared in *School District v. Arnold*, 21 Wis. *657. That case, however, was not a taxpayer's action, and the court, without considering the difference between the two actions, simply gave effect to the rule announced in the *Arnold Case*. There was a dissenting opinion in the *Krug Case* by WINSLOW, C. J., concurred in by Mr. Justice VINJE, in which it was pointed out, in effect, that the plaintiff had shown no such special injury as a taxpayer which enabled him to maintain the action. Our review of the case leads us to the conclusion that it is entirely out of line with every other taxpayer's action the maintenance of which has been sanctioned in this state, for the simple reason that no injury to taxpayers as such was present in the case. We decline to accord any weight to that case as constituting an authority for the maintenance of the Weisfeldt action.

The action by the Commission Company is not a taxpayer's action. The injury there alleged is that the plaintiff is subjected to unjust competition because the defendants Becker and Winkelman are enabled, by reason of their lease from the state fair board, to carry on a competing business at less expense than that at which plaintiff is burdened in carrying on and maintaining its business. This fails to disclose a wrong to the plaintiff for which the law affords redress. The plaintiff has no right to be immune from competition. This question received consideration in *Keen v. Mayor and Council of Waycross*, 101 Ga. 588, 29 S. E. 42, where the city operated a plumbing business as an alleged necessary incident to the operation of its waterworks plant. The plaintiff, a plumber and taxpayer, sought to

enjoin the city from the operation of the plumbing business, both on the ground that he was a taxpayer and one with whom the plumbing business of the city came into unjust competition. The court said:

"It was insisted, however, that, conceding the city had no right to conduct the business in question, this was a matter with which the plaintiff had no concern, and therefore he had no legal ground of complaint. Regarding the plaintiff merely in his capacity as a plumber, this point is well taken. Thus viewing him, the only effect of the city's action was to interfere, by way of competition, with a monopoly which he seems to have previously enjoyed. This immunity from the harassment of competition was but the result of mere chance, and he could assert no property right therein; for the law recognizes in no one a right to create or maintain a monopoly. 'The only injury of which he can be heard in a judicial tribunal to complain is the invasion of some legal or equitable right. If he asserts that the competition of the (city) damages him, the answer is that it does not abridge or impair any such right. If he alleges that the (city) is acting beyond the warrant of the law, the answer is that a violation of its charter does not of itself injuriously affect any of his rights' as a licensed plumber entitled to pursue his calling in the city; for the municipality 'is not shown to owe him any duty,' in that capacity, 'which it has not performed.'"

To this proposition the Georgia court cited *Railroad Co. v. Ellerman,* 105 U. S. 166, 174. In that case Ellerman sought to restrain the use to which certain wharfage property belonging to the railroad company was devoted. The property as so used came into competition with Ellerman, who claimed that the use of the property was *ultra vires* of the railroad company's charter. Discussing this question the court said:

"But if the competition in itself, however injurious, is not a wrong of which he could complain against a natural person, being the riparian proprietor, how does it become

so merely because the author of it is a corporation acting *ultra vires?* The damage is attributable to the competition, and to that alone. But the competition is not illegal. It is not unlawful for any one to compete with the company, although the latter may not be authorized to engage in the same business. The legal interest which qualifies a complainant other than the state itself to sue in such a case is a pecuniary interest in preventing the defendant from doing an act where the injury alleged flows from its quality and character as a breach of some legal or equitable duty. . . . The only injury of which he can be heard in a judicial tribunal to complain is the invasion of some legal or equitable right. If he asserts that the competition of the railroad company damages him, the answer is that it does not abridge or impair any such right. If he alleges that the railroad company is acting beyond the warrant of the law, the answer is that a violation of its charter does not of itself injuriously affect any of his rights. The company is not shown to owe him any duty which it has not performed."

It is scarcely necessary to say that a principle so self-evident does not require the support of such distinguished authority. The only right of the Commission Company which it is alleged has been infringed is the right to be immune from competition. It has no such right in the law. The law does not recognize any injury resulting from competition to any one engaged in trade or commerce. True, there are such things recognized in the law as unfair competition, which the law will suppress, but it goes without saying that this is not within any of the classes of competition recognized as unjust.

So far we have treated the questions, especially those arising in the taxpayer's action, as though they were legitimate actions to be resorted to for the purpose of staying the hand of a state officer. The impropriety of maintaining such an action against state officers was declared in the *Income Tax Cases,* 148 Wis. 456, 134 N. W. 673, 135 N. W. 164. One of those cases was an original action

brought in the supreme court. In an exhaustive review of the classes of cases which were properly subject to the original jurisdiction of this court, the opinion of Mr. Chief Justice WINSLOW touched upon the question of the maintenance of taxpayers' actions in this court, and it was said (p. 501) that "No such thing is known in the exercise of the original jurisdiction of this court. In actions brought within that jurisdiction the state is the plaintiff and sues to vindicate the rights of the whole people." Speaking of the taxpayer's action originating in the circuit court, and which was then before the court upon appeal, the opinion says:

"This seems to be a taxpayer's action pure and simple, brought in the circuit court to stay the hands of state officers from paying moneys out of the state treasury. We have already held in this opinion that no taxpayer's action can be maintained in the supreme court against the auditing or disbursing officers of the state. If such relief is sought it must be in an action by the state itself, either brought by the attorney general, or, in case of his refusal, by authority of the court itself, upon the relation of a private citizen. It would seem, *a fortiori,* that no taxpayer's action should be entertained in the circuit court where the purpose is to halt the auditing and disbursing officers of the state. We regard this as the better administration. It is enough that this court has the power to authorize such an action if the exigency demands. To divide up that power and scatter it among the trial courts of the state, and allow every such court to judge of the exigency, might well lead to the bringing of many improvident actions. It is fitting that such an extreme power be vested in this court alone." Page 518.

It is to be noted that this rule is prompted by considerations of good administration. It does not deprive any one of a remedy. The remedy is to be found in this court. If the attorney general refuses to act, any private citizen may make application to the court for leave to institute an action. Upon such application the court may consider whether the

rights and prerogatives of the state are so threatened as to justify judicial interference. This practice will protect the administrative officers of the state from interference and embarrassment prompted by trivial and inconsequential considerations. It is needless to say that this court would have been reluctant to entertain these actions, or either of them, upon the showing made.

It may be that the state fair board has met with some difficulty in showing that it has power to lease the state fair properties, but that it has pursued this practice for a great many years with the knowledge and acquiescence of the governor and the legislature itself, is quite persuasive that this feature of its administration is not injurious to the interests of the state.

Our conclusion is that the trial court correctly decided that neither of these actions was properly maintainable. This disposition of the case makes it unnecessary for us to consider the powers of the state officers, which we have chosen to refer to as the state fair board in this opinion. It might be the part of wisdom, if it is believed to be to the best interests of the state to deal with the state fair property in this manner, to secure more explicit authority.

*By the Court.*—Orders appealed from affirmed.